UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YOLANDA IDA HENNY,

                    Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 3/15/2017

15-CV-0629 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Yolanda I. Henny brings this action seeking judicial review of a decision by the Commissioner of Social Security (the "Commissioner"), which denied her applications for disability insurance benefits and Supplemental Security Income. The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

The Court finds that the Administrative Law Judge ("ALJ") gave good reasons for declining to give controlling weight to the treating physician's opinion, did not abuse his discretion in denying her subpoena of an examining doctor, properly evaluated Henny's credibility, and supported the determination of her residual functional capacity ("RFC") with substantial evidence. The Court also finds, on review, that the ALJ's decision was otherwise free of legal error and supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and the case is dismissed.

## I. PROCEDURAL HISTORY

### A. The Commissioner's Decision

Henny filed an application for disability insurance benefits and Supplemental Security Income on April 21, 2011, alleging disability as of February 18, 2011. Her application was denied

1

by the Social Security Administration (the "SSA") on August 24, 2011.  Administrative Record ("R.") (Dkt. No. 108), at 145–48.[1]  On October 12, 2011, Henny requested a hearing before an ALJ.  R. 149–50.  Hearings were held on August 14, 2012, March 12, 2013, and July 16, 2013 before ALJ Robert Gonzalez, at which Henny was represented by counsel.  R. 38–131.  On July 26, 2013, ALJ Gonzalez issued a decision finding that Henny did not have a disability as defined by the Social Security Act, and denying Henny's applications for disability insurance benefits and Supplemental Security Income.  R. 19–37.  After careful consideration of the entire record, the ALJ gave "little weight" to the opinions of Henny's treating physician and chiropractor and "great weight" to the opinions of three examining doctors.  R. 25.  The ALJ also found that Henny's "allegations of debilitating symptoms" was "not wholly credible," and determined that she is capable of performing past relevant work.  R. 27, 30.  Henny sought review of the ALJ's decision by the Appeals Council, which was denied on November 28, 2014, R. 1–6, making the ALJ's decision the final decision of the Commissioner.

**B. Court Proceedings**

Henny, proceeding pro se and in forma pauperis, timely commenced the instant action on January 26, 2015 seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  *See* Compl., Dkt. No. 2.  This case was assigned to the undersigned on March 2, 2015, and on March 11, 2015 the Court granted Henny leave to amend the Complaint, Dkt. No. 5, after which Henny field an Amended Complaint on April 1, 2015, Dkt. No. 6.  On April 8, 2015, the Court issued an Order of Service directing that the "U.S. Attorney's Office shall use its best efforts

---

[1] The Administrative Record consists of one docket entry with eleven attached supplemental documents. (Dkt. No. 108–1 to 108–11). For clarity and consistency, citations to the record will refer to the pagination which runs sequentially throughout the various entries and is marked in bold in the lower right-hand corner.

2

to file a notice of appearance within fourteen days of the date of this Order" and "[w]ithin 90 days of filing a notice of appearance, the Commissioner of Social Security shall serve and file an answer (including the Electronic Certified Administrative Record (e-CAR)) or other response to the complaint." Dkt. No. 7. The Commissioner, represented as it is in these matters by the U.S. Attorney's Office for the Southern District of New York, filed a notice of appearance on April 20, 2015, Dkt. No. 8, and on April 21, 2015, this case was referred to Magistrate Judge Fox for a Report and Recommendation, Dkt. No. 9. The Commissioner's Answer was thus due by July 20, 2015.

On or about July 10, 2010 respondent sent claimant an informal request seeking an extension of time. Pl.'s Mot. Default J., Dkt. No. 15, at 3. Henny did not consent and the Commissioner did not request an extension from the Court. On July 21, 2015, Henny filed an "Affidavit of Denial for Request of Time Extension," Dkt. No. 11, and after the Commissioner failed to respond by July 20, on August 31, 2015, Henny filed a Motion for a Default Judgment, Dkt. No. 15. On September 4, 2015 the Clerk of Court issued a Certificate of Default. Dkt. No. 17. That same day, the Commissioner filed an Opposition to the Motion for Default, explaining that its failure to abide by the July 20 deadline was due to "clerical error and oversight," and that although counsel had "prepared a letter requesting an extension of time . . . it appears that [she] never filed the letter." Dkt. No. 18, at 1. Counsel apologized for her oversight and requested the Court grant, *nunc pro tunc*, an extension of time until September 21, 2015 to respond to the Complaint. *Id.* at 2. Judge Fox issued an order on September 4, 2015, requesting Henny's written views on the Commissioner's request for an extension of time by September 14, 2015, Dkt. No. 19, which Henny submitted along with another Request for Entry of Default Judgment, Dkt. Nos. 20, 21.

On September 21, 2015, the Commissioner filed an Answer, the Administrative Record, and a Motion for Judgment on the Pleadings. Dkt. Nos. 22–26. On October 27, 2015, Judge Fox held an evidentiary hearing. Thereafter, Henny filed a Motion to Strike the Commissioner's Response as Untimely, Dkt. No. 32, which the Commissioner opposed, Dkt. No. 33. On December 17, 2015, Judge Fox denied the Commissioner's request that the Court grant, *nunc pro tunc,* an extension of time until September 21, 2015, to respond to the Complaint, "because the defendant failed to show that her failure to act timely is excusable neglect" and directed the Clerk of Court to "strike the Defendant's untimely and unauthorized Answer with the Certified Administrative Record and the Defendant's Motion for Judgment on the Pleadings." Dkt. No. 47, at 21. Specifically, Judge Fox found that the Assistant U.S. Attorney "acted for an improper purpose, in bad faith, causing further delay and unnecessary motion practice, in contravention of Rule 1 of the Federal Rules of Civil Procedure." Dkt. 47 at 21–22. Following additional motion practice, on February 29, 2016, Judge Fox denied the Commissioner's Motion for Reconsideration. Dkt. No. 77.

On March 15, 2016, the Commissioner filed objections to Magistrate Judge Fox's denial of the Commissioner's request for a *nunc pro tunc* extension of time, decision to strike the Commissioner's submissions, and denial of the Commissioner's Motion for Reconsideration. Dkt. No. 80. Henny filed a request for entry of a default judgment, Dkt. No. 83, and the Commissioner requested a stay, Dkt. No. 85, which the Court granted, Dkt. No. 86. On April 11, 2016, Henny requested a hearing, which the Court ordered. Dkt. No. 88. After Henny indicated that she would be interested in pro bono counsel, the Court secured a pro bono attorney and arranged for her to contact Henny to discuss the possibility of pro bono representation. Dkt. No. 95. But, on May 4, 2016, Henny then wrote to the Court saying that she wished to represent herself at the hearing.

4

Dkt. No. 96.

The Court held a day-long evidentiary hearing on June 29, 2016, at which four witnesses testified and were cross-examined by Henny. Dkt. 116 (Transcript). Following the hearing, the Court ruled that Judge Fox's determination that the Assistant U.S. Attorney acted in bad faith was clearly erroneous and that it was clearly erroneous to strike the Administrative Record and Answer. Dkt. 116, at 237–39. Accordingly, it ordered that Magistrate Judge Fox's December 17th and February 29th Orders be set aside pursuant to Federal Rule of Civil Procedure 72(a) and granted Defendant's motion for a *nunc pro tunc* extension of time to file its Answer, Motion for Judgment on the Pleadings, and the Administrative Record. Dkt. No. 109. The Commissioner filed these submissions the following day, on June 30, 2016. Dkt. Nos. 107, 108, 110, 111. On August 16, 2016, Henny submitted her opposition to the Commissioner's Motion for Judgment on the Pleadings, Dkt. No. 119,[2] and on September 6, 2016 the Commissioner submitted a Reply, Dkt. No. 122.[3]

---

[2] On August 10, 2016, Plaintiff Yolanda Henny requested that the Court attempt to obtain pro bono counsel for her, as it had previously. The same day, the Court stated in an endorsement that it would "endeavor to find pro bono counsel to assist Ms. Henny in opposing the Government's motion for judgment on the pleadings." Dkt. No. 118. Prior to the Court's identification of counsel, however, on August 16, 2016, Ms. Henny filed an opposition to the Government's motion fourteen days before it would have been due on August 30, 2016. *See* Dkt. No. 119. In light of her opposition brief, the Court ordered that Henny inform the Court, by letter, if she still desires pro bono counsel on or before August 23, 2016. Dkt. No. 120. The Court told Henny that "[i]f she does, and the Court can secure such counsel, Ms. Henny will be permitted to submit a supplemental brief prepared by the attorney." Dkt. No. 120. On August 20, 2016, Henny sent a letter to the Court stating she was in the process of speaking with a potential attorney and did not indicate that she wanted to Court's help in finding pro bono counsel. Dkt. No. 121. On October 4, 2016, the Court ordered that Henny send a letter to the Court no later than October 11, 2016 providing the Court with an update on whether Plaintiff has retained counsel, whether Plaintiff would like the Court to attempt to obtain pro bono counsel for her, or whether the Plaintiff intends to proceed pro se. Dkt. No. 124. Having not heard from Henny since, the Court relies on her pro se submission.

[3] Henny filed a notice of appeal to the Court of Appeals on July 2, 2016, Dkt. No. 112, which was dismissed on September 8, 2016, because "[t]he case [was] deemed in default." Dkt. No. 123.

## II. ADMINISTRATIVE RECORD

### A. Non-Medical Evidence

Henny was born on March 21, 1973, and was 37 years old on the date of the alleged disability onset on February 18, 2011.  R. 280.  She received her GED, R. 113, and took some college level courses, R. 114.  She has two adult children.  R. 486.

Prior to the alleged disability onset date, Henny worked as an office assistant, a telemarketer, a security guard, a waitress, and a food service worker.  R. 322–29; *see also* R. 360.  Beginning in 2008, she worked as a secretary at Regina Check Cashing.  R. 61–62.  Henny testified at the hearing before the ALJ that she stopped working in February of 2011 because she "couldn't sit anymore," R. 65, 107, the "spasms, the herniated disk, the two pinched nerves made it just impossible."  R. 65.  Henny believes her injuries are traceable to a car accident in April 2009.  R. 100, 125; *see* Pl.'s Opp., Dkt. No. 119, at 3 (Henny "sought medical help for constant and continuous pain in her neck, back, and legs, sustained as a result of an April 2009 car accident.").

Henny appeared at two hearings before the ALJ, at which she was represented by counsel.  She testified at the hearing that she lives by herself and is a "shut-in."  R. 73.  She explained that she is able to cook, clean, and shop with the assistance of her boyfriend, but that sweeping has become "extremely difficult," she is unable to mop, and she cleans less frequently.  R. 104, 126.  She spends most of the rest of the day praying, meditating, and reading.  R. 127.  She testified that she must lie on her stomach most of the day.  R. 70.  The ALJ observed that during these hearings "the claimant betrayed no evidence of debilitating symptoms while testifying."  R. 28.

### B. Medical Records

#### 1. *Mark Kraushaar, M.D.*

On December 21, 2010 Henny was evaluated by Dr. Kraushaar with complaints of

6

"heaviness in her legs and weakness in both legs," pain in the back of her thighs from sitting, mild low back pain, and tingling down her legs to her toes. R. 487. Dr. Krasuhaar's diagnostic impression was "low back pain, bilateral hamstring weakness and sprain, right quadriceps sprain, lumbar radiculopathy, lymph edema in the left leg." R. 488. He proscribed physical therapy and recommended an MRI if Henny did not see improvement by January 1, 2011. R. 488. He also conducted a CT scan on her pelvis, which revealed an adnexal mass which "sounds like a cystic ovary." R. 488.

### 2. *Hudson Valley Radiology Associates*

On March 4, 2011 Henny had a series of MRIs of her lumbar spine, cervical spine, lumbosacral spine, and hips. R. 500–08. These were performed by Steven Klein, M.D., Elliot Hadler, M.D., and Joe Schwartz, M.D. The findings were as follows:

> In the lumbar spine:

> At L5-S1, there is mild disc degeneration with a small extruded disc into the right lateral recess and neural foramen, obliterating fat below the exiting L5 nerve root in the foramen and abutting the right S1 nerve root in the lateral recess. There is mild flattening of the anterior aspect of the thecal sac on the right.

R. 500.

In the cervical spine it was determined that: [a]t C3-4, there is mild degenerative spondylosis, [a]t C4-5, there is mild degenerative spondylosis, [a]t C5-6, there is a degenerated disc with mild bulging of the disc annulus and degenerative spondylosis with compromise of the anterior epidural space across the midline, greater on the right side. . . .[a]t C7-T1, there is mild degenerative spondylosis." R. 502. The C2-3 disc and the C6-7 disc were unremarkable, finally that "there are no intradural masses. The spinal cord demonstrates normal signal intensity. The craniocervical junction is normal. The facet joints are unremarkable." R. 502. There is a "slight

7

disc space narrowing at the C7 T1 level" with "slight evidence of degenerative change." R. 505. The impression was "[m]ild degenerative change." R. 505.

At the lumbosacral spine, "[t]here is evidence of degenerative change with anterior spurring of the upper vertebral body endplates of L4 and L5. There is a slight disc space narrowing at the L4-5 level. . . . no fracture or subluxation." R. 504. The MRIs of Henny's hips showed "normal" and "unremarkable" studies. R. 506–08.

### 3. *Columbia Doctors of the Hudson Valley*

In February and March of 2012, Henny was seen by doctors at Columbia Doctors of the Hudson Valley for an echocardiogram and stress testing. R. 548–57.

## C. Treating Physician's & Chiropractic Disability Opinions

### 1. *Deepak Vasishtha, M.D.*

Henny began seeing Dr. Vasishtha, at Musculoskeletal Pain Management, on August 22, 2011, complaining of neck pain radiating to bilateral upper extremities and low back pain radiating to bilateral lower extremities. R. 521. He conducted neurological, musculoskeletal, and deep tissue reflex orthopedic testing and range of motion testing for her cervical and lumbar spine. R. 522–23. His assessment was that Henny had "post lumbar and cervical disc herniation along with early spondylosis in the cervical and lumbar region along with lateral recess stenosis resulting in lumbar and cervical radiculopathy." R. 523. Dr. Vasishtha treated Henny with "lumbosacral epidural injections for radicular component of pain" during September 2011 through February 2012. R. 535–39; R. 560. The record also contains treatment records from January 18, 2012, during which Dr. Vasishtha conducted additional testing and slightly modified his assessment to "post multilevel degenerative disc disease, disc herniations in the cervical and lumbar spine with cervical and lumbosacral radiculopathy along with chronic pain syndrome." R. 519–20.

On March 13, 2012, Dr. Vasishtha conducted a disability evaluation, concluding that Henny "is permanently disabled more than 75%" and "[t]he disability is classified as severe-partial." R. 564. He assessed that she had (1) "[l]umbar disc herniation resulting in lateral recess stenosis causing chronic low back pain," (2) "[l]umbosacral radiculopathy, bilateral at L5-S1 levels," (3) [c]ervical degenerative disc disease with disc bulge at C5-C6 resulting in lateral recess stenosis," (4) "[a] chronic cervical radiculopathy," (5) "[c]hronic pain syndrome," as well as (6) "[c]hronic lymphedema" and (7) "sequelae of cardiac disease on lifelong cardiac medications." R. 564. He made these conclusions based on his own physical examination as well as a review of the medical records. R. 559–64, 608.[4]

### 2. Mariyam B. K. Mathew, D.C.

Henny began seeing Dr. Mathew, a chiropractor, on January 19, 2011. R. 491, 592. Dr. Mathew diagnosed Henny with multiple cervical subluxations, subluxation of lumbar vertebrae, pain in joint, pelvic region and thigh, cervical spine/strain, and lumbosacral sprain/strain. R. 595. Henny was treated two times per week for "C/S subluxation, torticollis, headache, 4S subluxation, 4S degeneration, piriformis syndrome, neuritis." R. 491. Henny's symptoms included "low back pain, pain on posterior Rt thigh, neck pain." R. 491. Dr. Mathew conducted three comprehensive examinations, in January 2011, on July 12, 2011, and on October 5, 2011. Medical records show that between March 1, 2011 and May 10, 2011 Henny had an office visit with Dr. Mathew twenty times. R. 596–604.

---

[4] On October 23, 2012, Dr. Vasishtha replied to a questionnaire sent to him by ALJ Gonzalez. The questionnaire "cc-ed" Yolanda I. Henny and indicated that it included as an exhibit Dr. Vasistha's medical source statements and opinions. R. 609. The questionnaire stated that it sought to clarify and understand the basis of Dr. Vasistha's medical opinions in connection with "Mr. John J. Wilson's Social Security Disability claim." R. 606. As neither party has suggested this questionnaire was not concerning Ms. Henny, the Court assumes the reference to Mr. Wilson was a typographical error.

On July 28, 2011 Dr. Mathew submitted a questionnaire to the New York State Office of Temporary and Disability Assistance, in which she commented that "[patient] showed considerable improvement in the cervical (neck pain, stiffness [and] headache). Ms. Henny [is] slow in improvement in her low back pain due to the occasional exacerbation," and that her "prognosis is good." R. 492. In this same questionnaire Dr. Mathew opined that Henny could stand and/or walk less than 2 hours per day and sit less than ½ hour per day. R. 494.

The record also contains an affidavit prepared by Dr. Mathew dated September 20, 2012, which appears to have been prepared in connection with a civil lawsuit Henny had pursued arising from the 2009 car accident. R. 611–19. This affidavit summarizes the testing and treatment provided by Dr. Mathew prior to September 20, 2012.

On October 19, 2013, Dr. Mathew completed an updated multiple impairment questionnaire. This questionnaire was submitted to the Appeals Council as an attachment to Henny's request that the Appeals Council review the ALJ's decision.[5] She concluded that Henny could sit 15 minutes and stand/walk for 30 minutes in an eight hour day, and that Henny must get up and move around every 15 minutes. R. 672. Dr. Mathew stated that Henny could occasionally lift and carry up to 10 pounds and has "minimal limitations" on grasping, turning, twisting objects, using fingers/hands for fine manipulations, and "moderate" limitations using arms for reaching. R. 673–74. She opined that Henny's experience of pain, fatigue or other symptoms was severe enough to interfere with her attention and concentration "frequently" and "constantly." R. 675. She evaluated Henny as not being able to push, pull, kneel, bend, or stoop. R. 676. In her opinion

---

[5] "[E]vidence first submitted to the Appeals Council becomes part of the administrative record . . . . When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine . . . whether there is substantial evidence to support the decision of the Secretary." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

"the earliest date" that the description of symptoms and limitations in this questionnaire" applied was 2009-2010. R. 676. She also opined that "[p]atient maybe a candidate who could work from home with appropriate chair, desk." R. 676.

### D. Consultative Examinations

#### 1. Mark Johnston, M.D.

On July 21, 2011, Henny was referred by the Division of Disability Determination for an internal medicine examination by Dr. Johnston. R. 509–12. According to Henny, the exam lasted approximately 20 minutes. Pl.'s Opp. at 6. Dr. Johnston diagnosed Henny with "[c]hronic back pain with normal range of motion" and concluded she "has a moderate restriction of bending and lifting because of chronic low back pain." R. 511–12. He noted that Henny's gait was normal, she "can walk on heels and toes without difficulty. Squat full. Stance normal. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty." R. 510. For the musculoskeletal exam, Dr. Johnston found Henny's cervical spine and lumbar spine showed full flexion and range of motion. Her shoulders, elbows, forearms, wrists, hips, knees, and ankles also had a full range of motion. And he found no evident subluxations, contractures, ankylosis or thickening. R. 511. For the neurologic part of the exam, he found Henny's deep tissue reflexes were normal, no sensory deficit, and strength 5/5 in the upper and lower extremities. R. 511.[6]

#### 2. Earl Zeitlin, M.D.

On February 2, 2012, Henny was referred by her primary care doctor to Dr. Zeitlin for a

---

[6] Dr. Johnston also recommended that Henny "follow up with her physician or cardiologist regarding her heart rhythm to ascertain the possible need for anticoagulant therapy." R. 512. Henny had "an open heart surgery for ventricular septal defect, atrial septal defect and another hole in the heart at age six years," R. 559, but that is not the basis for her disability claim. *See* Pl.'s Opp. at 1–2.

neurological consultation. R. 631. Dr. Zeitlin indicated that he had not yet reviewed Henny's CT and MRI imaging at the time he prepared his report. R. 631, 633. His assessment was that Henny had "Neuritis or Radiculitis Thoracic or Lumbosacral Unspec." and her symptoms "suggest persistent right S1 radiculopathy." R. 633. In his examination, Dr. Zeitlin found Henny's neck had a full range of motion, and her motor strength and muscle tone were normal, as were her gait heel-toe and tandem walk. R. 632–33. He also found that she had "normal sensation to touch, temperature, vibration and pinprick in all four extremities." R. 633.[7]

### 3. *Rene Elkin, M.D.*

On May 17, 2012, Dr. Elkin examined Henny "at the request of the defendant in connection with a bodily injury lawsuit," for which she was the plaintiff and produced an independent medical exam report for defense council. R. 657. After reviewing Henny's medical records and conducting a neurological physical examination, Dr. Elkin concluded that "[t]he neurological physical examination reveals no objective findings for any structural neurological injury resulting from this accident. . . . X-rays and MRI studies of the cervical and lumbosacral spines reflect mild degenerative disease for which there is no causal relationship to this accident. Furthermore the degenerative disease noted on the radiologic studies would, in my opinion, not account the inability to move her neck and lower back as noted during my examination." R. 661–62.

Dr. Elkin also remarked that "[w]hile she is unable to move her neck and lower back during the course of the examination, I observed her when taking off her shoes and moving after the examination that there was full movement on flexion of her neck and her lower back." R. 661. In Dr. Elkin's opinion, "her symptoms are embellished and are not consistent with the nature of the

---

[7] Zeitlin also noted that Henny had no edema, R. 632, which seems to be an error, as it is undisputed that she does have edema.

injury and her inability to function at her pre-accident level without restrictions." R. 662.

### E. Medical Evidence Submitted to the Court

Henny attached several additional medical records to her Complaint, which are not found in the administrative record. Dkt. No. 6, at 17–29. These records include orthopedic examinations and treatment plans from Dr. Mathew dated January 7, 2012, June 8, 2012, and October 5, 2013. Henny also included a report dated February 23, 2015 by Michael Carlin M.D., from Rockland Diagnostic Imaging, who conducted an MRI. Dr. Carlin's impression was that Henny has a "large right-sided disc herniation extending to the proximal right neural foramina at L5-S1 with likely impingement on the existing right L5 nerve root. Deformity on the right ventral thecal sac is also identified." Dkt. No. 6, at 17.

### F. Vocational Expert

A vocational expert, Karen Simone, testified at the March 2, 2013 hearing. R. 81. In response to questioning by the ALJ, Simone testified that a hypothetical person with the claimant's age, education and work history, who could engage in limited sedentary work, and who "could only occasionally stoop, crouch, crawl, kneel, balance and climb;" only "frequently extend, flex and rotate the neck;" and who must be able to "sit/stand at will," could do Henny's past work as an administrative clerk and as a telemarketer. R. 85. Simone noted that in both of these jobs, Henny had said that she had the ability to sit and stand as needed. R. 85. Simone also testified that a person with the described residual functioning capacity could do the following three jobs in the national economy: "appointment clerk," "checker II," and "[c]ompiler." R. 86–87.

When asked by Plaintiff's counsel, if a claimant "needed to sit/stand at will defined as the person could sit no more than 15 minutes at a time and then could stand no more than 15 minutes at a time, and in between would need to take at least a five to 10 minute break whereby they would

be off task, would they be able to do any jobs in the national economy?" Simone answered "no."

R. 87. Simone also testified that if pain, fatigue or other symptoms affected a person's attention

and concentration such that they would be off task 15 to 20 percent of the day, there would be no

jobs in the national economy. She elaborated that "especially when you're talking about unskilled

and the lower semi-skilled jobs anything greater than 10 to 15 percent off task and you're putting

your employment at jeopardy." R. 88.

## III. LEGAL STANDARDS

### A. Judicial Review of the Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner "in the

district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C.

§ 405(g). "In reviewing a final decision of the Commissioner, a district court must determine

whether the correct legal standards were applied and whether substantial evidence supports the

decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (citation omitted).

The substantial evidence standard is a "very deferential standard of review—even more so

than the 'clearly erroneous' standard," *Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 448 (2d Cir.

2012), and the reviewing court must be careful "not [to] substitute its own judgment for that of the

[Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."

*Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human*

*Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984)). "[S]ubstantial evidence is more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,*

402 U.S. 389, 401 (1971)) (quotation marks and alterations omitted). "[O]nce an ALJ finds facts,

[a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"

14

*Brault,* 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir. 1994)).

In determining whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian,* 708 F.3d at 417 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B. A Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord id.* § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *accord id.* § 1382c(a)(3)(B).

When assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur,* 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.,* 463 F.2d 38, 41 (2d Cir. 1972). Specifically, the Commissioner's decision must take into account

15

factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

The Commissioner's determination of disability follows a "five-step sequential evaluation process." 20 C.F.R § 404.1520(a)(4); *see Cichocki v. Astrue,* 729 F.3d 172, 173 n.1 (2d Cir. 2013). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a severe impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpart P. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet the severity requirements of a listing, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner determines the claimant's residual functioning capacity ("RFC"), and continues on to the fourth step, to decide if the claimant's RFC allows her to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work, considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009).

16

## IV. ALJ'S DECISION

In a decision dated July 26, 2013, the ALJ determined that Henny was not disabled as defined by the Social Security Act and relevant regulations and therefore denied her claim for disability insurance benefits and Supplemental Security Income. R. 22–31. At step one, the ALJ determined that Henny had not engaged in substantial gainful activity since the alleged disability onset date of February 18, 2011. R. 24. At step two, the ALJ determined that Henny had the following severe medically determinable impairments: "disc herniation at L5-S1; disc bulge with degenerative disc disease (DDD) of the cervical spine; cervical and lumbosacral strains; atrial fibrillation (AFIB); and chronic lymphedema of the left lower extremity." R. 24; *see* 20 C.F.R. § 404.1520(c).

At step three, the ALJ determined that Henny did not have an impairment or combination of impairments that reach the level of severity to meet the criteria of a listing in Appendix 1 of 20 C.F.R. Pt. 404, Subpart P (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ made this determination based on a finding that Henny is able to "ambulate independently and . . . is neurologically intact." R. 25.

Before considering step four of the sequential evaluation process, the ALJ found that Henny had the RFC to "perform sedentary work as defined in 20 C.F.R. [§] 404.1567(a) except that the claimant can occasionally engage in stooping, crouching, crawling, kneeling, balancing and climbing; she can frequently flex, extend and rotate the neck, and she must have the ability to sit and stand at will." R. 25. In coming to this conclusion, the ALJ found that, although Henny's medically determinable impairments could reasonably be expected to cause some of the symptoms alleged, Henny's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 26. This credibility determination was made by evaluating

17

the record in accordance with the factors described in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) and SSR 96-7p. R. 27. At step four, the ALJ determined that Henny was capable of performing past relevant work as an administrative clerk and telemarketer, relying on the testimony of an impartial vocational expert, Karen Simone, and Henny's testimony that she could sit and stand at will when performing those jobs. R. 30. Therefore, the ALJ concluded that Henny was not disabled. R. 31.

## V. ANALYSIS

As a preliminary matter, it is not contested that the ALJ properly developed the record. Rather, Henny contends primarily that the ALJ's determination was not supported by substantial evidence; that the ALJ failed to properly weigh the evidence, specifically by giving too much weight to three non-treating sources and not giving sufficient weight to the opinions of her treating doctor and chiropractor; erred in denying Henny the right to question the credibility of one of the examining doctors, Rene Elkin; and erred by failing to properly assess Henny's RFC. *See* Pl.'s Opp. at 2, 17–23.

Having reviewed the record, the Court first affirms the ALJ's findings at steps one through three. Namely, the Court concludes that substantial evidence supports the ALJ's findings that Plaintiff had not been engaged in any substantial gainful activity since February 18, 2011; that Plaintiff had severe impairments, including disc herniation at L5-S1, disc bulge with degenerative disc disease of the cervical spine, cervical and lumbosacral strains, atrial fibrillation, and chronic lymphedema of the left lower extremity; and that Plaintiff's impairments did not meet or equal one of those listed in Appendix 1 to 20 C.F.R. pt. 404, subpart P. R. 24-25. Henny does not challenge these findings.

The Court also finds that the ALJ's decision not to give controlling weight to the opinion

18

of Henny's treating physician was supported by good reasons, and the ALJ also did not err in denying the subpoena of Dr. Elkin. Moreover, the ALJ's determination that Henny's was not wholly credible, and that she has an RFC that allows her to perform past relevant work is supported by substantial evidence. Finally, the medical records Henny has provided to the Court do not require remand.

### A. Weight Given to Medical Evidence

Henny contends that the ALJ's determination was not supported by substantial evidence and that it failed to properly weigh the evidence. The Court disagrees. The ALJ's decision not to give controlling weight to the opinions of Henny's treating physician and chiropractor was supported by good reasons.

"'Regardless of its source,' the ALJ must evaluate 'every medical opinion' in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787, 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (quoting 20 C.F.R. §§ 404.1527(d), 416.927(d)). A treating physician's opinion, however, is given controlling weight, meaning it is binding, if the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Selian,* 708 F.3d at 418. The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the

19

medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion will not always be controlling, however. Where "'the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight.'" *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (alteration in original); *see also Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given."). Additionally, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue,* No. 09-CV-3928, 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell,* 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

Before deciding how much weight to give a treating physician, "the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record.'" *Selian,* 708 F.3d at 420 (quoting *Burgess,* 537 F.3d at 129). Thus, "[p]roper application of the [treating physician] rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions." *Lacava v. Astrue,* No. 11-CV-7727, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *report and recommendation adopted,* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

If the ALJ declines to credit the opinion of a treating physician, he must give "good reasons," *Snell,* 177 F.3d at 133, and the ALJ must "comprehensively set forth reasons for the weight" ultimately assigned to the treating source, *Halloran,* 362 F.3d at 33. Failure to give good

reasons is grounds for remand. 362 F.3d at 33. "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider 'factors' to determine how much weight to give the opinion" including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Id.* at 32; *see also* 20 C.F.R. § 404.1527(c)(2). But the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue,* 266 F. App'x 66, 67 (2d Cir. 2008) (summary order) (quoting *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983)).

Under the treating physician's rule, it is "within the province of the ALJ" to resolve conflicts in the medical evidence in light of all evidence in the record. *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002); *see Micheli v. Astrue,* 501 F. App'x 26, 29–30 (2d Cir. 2012) (summary order) ("[B]ecause it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution, the ALJ will weigh all of the evidence and see whether it can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent."). When a treating physician's opinion is internally inconsistent or inconsistent with other substantial evidence in the record, the ALJ may give the treating physician's opinion less weight. *Snell,* 177 F.3d at 133 (2d Cir.1999); *see also Micheli,* 501 F. App'x at 28 ("A physician's opinions are given less weight when his opinions are internally inconsistent."); *Halloran,* 362 F.3d at 32 (holding that a treating physician's opinion may not be afforded controlling weight where it is not consistent with other substantial evidence in the record); *Veino,* 312 F.3d at 588 (where "the record plainly

21

contained conflicting psychological evaluations of [the claimant's] present condition, . . . it was within the province of the ALJ" to accept portions of a doctor's opinion while rejecting other portions). A court may not substitute its judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Veino,* 312 F.3d at 586.

Here, the ALJ gave "little weight" to Dr. Vasishtha and Dr. Mathews' opinions, the two medical professionals who treated Henny. R. 25. Instead, the ALJ gave "great weight" to the opinions of Drs. Zeitlin, Elkin, and Johnson, who were all examining doctors. R. 25.

The ALJ did not err by refusing to give Dr. Vasishtha's opinion controlling weight. The ALJ explained that "Dr. Vasishtha's clinical findings and opinions are inconsistent with the other substantial evidence of record," particularly the neurological evaluations conducted by Drs. Zeitlin and Elkin, both of whom found that Henny is neurologically intact, as well as Dr. Elkin's opinion that she was exaggerating her symptoms, which were inconsistent with the nature of her injury. R. 28–29. "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." *Mongeur,* 722 F.2d at 1039 (citations omitted).

Having decided not to accord Dr. Vasishtha's opinion controlling weight, the ALJ properly analyzed the appropriate factors to determine how much weight to give his opinion. *See* 20 C.F.R. § 404.1527(c). The ALJ considered that Dr. Vasishtha was Henny's "treating physiatrist," R. 28, and that he "is a specialist in Physical Therapy and Rehabilitation," R. 29. The ALJ also considered evidence in the record that would support Dr. Vasishtha's opinion including that the x-rays of Henny's cervical and lumbar spines and MRI scans showed mild degenerative changes with slight disc space narrowing, mild multilevel degenerative spondylosis, and "mild disc

22

degeneration with a small disc herniation at the L5-S1 extending into the neural foramen." R. 26. Ultimately, however, the ALJ gave Dr. Vasishtha's opinion "little weight," R.25, because he examined the consistency of his opinion with the record as a whole and found it to be inconsistent. *See e.g.*, *Halloran,* 362 F.3d at 32. Although the ALJ did not specifically discuss the frequency of examination and the length, nature and extent of the treatment relationship, an "ALJ does not have to explicitly walk through these factors, so long as the Court can 'conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] "good reasons" for the weight she gives to the treating source's opinion.'" *Camille v. Colvin*, 104 F. Supp. 3d 329, 341 (W.D.N.Y. 2015) (alterations in original) (quoting *Halloran,* 362 F.3d at 32), *aff'd*, 652 F. App'x 25 (2d Cir. 2016). The ALJ did so here, when he found substantial inconsistencies between the findings of Dr. Vasishtha and the majority of the record.

The ALJ also properly considered the opinion of Mariyam B. K. Mathew, D.C. R. 29. The ALJ recognized that although a chiropractor is not an "acceptable medical source[]," he should apply the same factors as he does with an acceptable medical source to decide how much weight to give the opinion. *Titles II & XVI:II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernment*, SSR 06-03P, 2006 WL 2329939, *2–3 (S.S.A. Aug. 9, 2006). The ALJ considered that Dr. Mathew was a chiropractor and had a treating relationship with Henny. R. 29. The ALJ then found that Dr. Mathew's opinion that Henny is totally disabled was not supported by her own treatment notes or reports, which state that Henny had been making progress, and that her neck and low back pain had improved. *Id.* Dr. Mathew's notes also indicate that in October 2011, Henny had normal cervical and neurological findings. *Id.* The ALJ further considered that Dr. Mathew's opinion was inconsistent with the medical opinions

23

of three examining sources, Drs. Johnston, Zeitlin and Elkin.  *Id*.[8]

The ALJ also adequately considered the required factors in deciding to give the opinions of Drs. Johnston, Zeitlin, and Elkin "great weight."  R. 25.  First, the ALJ recognized that each of these doctors was an examining doctor.  *See* R. 27 (Dr. Johnston is an "examining source"); R. 28 (identifying Dr. Zeitlin and Dr. Elkin as "examining physicians"); R. 26 (explaining that Dr. Elkin performed an independent medical exam that is "adverse" to the claim for disability," a copy of which the ALJ received by subpoenaing Henny's personal injury attorney).  The ALJ also took account of their specialties.  *See* R. 27 (Dr. Johnston is an "expert" in examining claimants for the SSA); R. 29 (Dr. Zeitlin and Dr. Elkin "are both Neurologists (and specialists in this field).").  The ALJ considered that all three doctors' opinions were supported by their findings.  *See* R. 29 ("Dr. Johnston's assessment . . . is supported by a fully normal musculoskeletal examination with no neurological deficits"); R. 28 (Dr. Zeitlin and Dr. Elkin's opinions are "well supported by their own clinical findings, observations, and interpretation of the radiographic findings"); R. 28 (Dr. Elkin's opinion was supported by "his personal observations" of Henny).  Further, the ALJ found that these three doctors' opinions were consistent with each other, and thus, the evidence in the record as a whole.[9]

Henny argues that Dr. Elkin's report was given too much weight because Dr. Elkin, who

---

[8] Although the ALJ's finding that Dr. Mathew "has not treated the claimant in almost two years," R. 29, was supported by the records submitted to the ALJ, records submitted by Henny to the Appeals Council and to the Court show this to be inaccurate.  Remand is not necessary, however, because that fact was just one of many the ALJ relied on in determining to give Dr. Mathew's opinion "little weight," and that determination is supported by other substantial evidence.

[9] Henny contends that Drs. Johnston, Zeitlin, and Elkin must be considered only as "opinion evidence" due to the fact that they are non-treating sources, citing 20 C.F.R. § 404.1527(e).  *See* Pl.'s Opp. at 18, 22.  That provision, however, applies only to the "[o]pinions of nonexamining sources," not all non-treating sources.  Drs. Johnston, Zeitlin, and Elkin were all examining doctors.

represented Henny's adversary in the personal injury suit, had an "adversarial intent when she wrote the report" and her "only concern was to disprove causality between an April 2009 accident, and [Henny's] resulting injuries." Pl.'s Opp. at 19. Dr. Elkin's report came with the attached disclosure: "I did not provide any treatment for Yolanda Henny, I only examined her at the request of the defendant in connection with a bodily injury lawsuit. Enclosed you will find a copy of the I[ndependent] M[edical] E[xam] report I produced for the defense council." R. 657. The ALJ was clearly aware that the report was requested by opposing counsel in defense of a personal injury lawsuit brought by Henny, as the ALJ had to subpoena the report to get access to it, a fact he explained in his decision. R. 26 (explaining that on March 12 and 26, 2013 subpoenas were issued to personal injury attorney for medical records in his possession). It is the ALJ's decision what weight to afford to medical evidence, and the ALJ's decision to give Dr. Elkin's report "great weight" even though it was prepared for an adverse party in a civil lawsuit was not impermissible as a matter of law.

Henny also argues that the ALJ gave too much weight to the reports of Dr. Johnston, Dr. Zeitlin, and Dr. Elkin because these reports do not indicate that the doctors performed orthopedic testing and do not contain measurements of Henny's range of motion. *See* Pl.'s Opp. at 6, 8, 11. These specific tests, however, are not a prerequisite to attributing "great weight" to an examining doctor's opinion. The ALJ properly considered the weight to afford to each doctor's report and opinion pursuant to 20 C.F.R. § 404.1527(c). The Court is bound to uphold the ALJ's conclusion here because "a reasonable factfinder would [not] *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin, Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citation omitted); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

Similarly, Henny correctly points out that 20 C.F.R. § 404.1513(b)(5) provides that "medical reports should include . . . [t]reatment prescribed with response, and prognosis." But the failure of a medical report to include that information does not disqualify it from consideration. Instead, an ALJ must evaluate what weight to give the report under the factors proscribed by 20 C.F.R. § 404.1527(c), as the ALJ did here.

Henny also argues that Dr. Elkin's report violates "20 C.F.R. 404, Subpt. P, App. 1 E." because it "failed to provide a complete and specific range of motion result of the neck and spine, given quantitatively in degrees." Pl.'s Opp. at 19. That provision however, is the "listing of impairments," and concerns whether a claimant's condition meets the listing at step three. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ found that Henny's condition did not meet the listing (a finding that she does not challenge) and thus it is not relevant. More importantly, the listings do not direct how an ALJ should weigh medical opinions, which is governed by 20 C.F.R. § 404.1527(c).

**B. Subpoena of Dr. Elkin**

Henny also asserts that the ALJ erred "by not allowing [her] to cross-examine Rene Elkin and question the validity and credibility of her report." Pl.'s Opp. at 20. On April 19, 2013, Henny's attorney advised the ALJ that if "Dr. Elkin's report is admitted to the record over our objections and given any significant weight in assessing Ms. Henny's allegations then we request a supplemental hearing where Dr. Elkin is subpoenaed to submit to cross examination on his findings." R. 402. On July 16, 2013, the ALJ denied this request in a written opinion because "the claimant's requested subpoena is not reasonably necessary for the full presentation of the claimant's case and because the claimant has failed to comply with the full procedural requirements set forth in 20 [C.F.R. §] 404.950(d)." R. 273. In so doing, the ALJ explained that

26

the subpoena request "fails to state what important facts the witness would prove absent the issuance of the subpoena . . . the case appears fully developed with reports from the claimant's treating sources and counsel has failed to provide a reason why Dr. Elkin's opinion could not be rebutted with other evidence already in the case file." R. 272. The ALJ also held a hearing at which he informed Henny's counsel that he was denying the subpoena request. R. 41.

The regulations provide that

> [p]arties to a hearing who wish to subpoena documents or witnesses must file a written request for the issuance of a subpoena with the administrative law judge or at one of our offices at least 5 days before the hearing date. The written request must give the names of the witnesses or documents to be produced; describe the address or location of the witnesses or documents with sufficient detail to find them; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.

20 C.F.R. § 404.950(d)(2) (Effective August 9, 2010 to June 19, 2013).

An ALJ's decision to deny a subpoena is reviewed for abuse of discretion. *Yancey v. Apfel*, 145 F.3d 106, 113 (2d Cir. 1998). In *Yancey*, the Second Circuit found that the ALJ did not abuse his discretion by denying a subpoena of a Dr. Wong when "[t]he ALJ (1) allowed [claimant] a fair and meaningful opportunity to present her case and (2) had no indication that Dr. Wong's (or any physician's) reports were inaccurate or biased or that subpoenaing Dr. Wong would have added anything of value to the proceedings." *Id.* In *DeChirico v. Callahan*, the Second Circuit similarly held that the ALJ did not err in denying the claimant's request to subpoena his prior disability file because the request of the claimant, who was represented by counsel, "in no way complied with the requirements of § 416.1450(d)(2)" and "because the fact of his impairment was not in dispute, and because counsel offered no other reasons that the ten-year old file might be relevant." 134 F.3d 1177, 1184 (2d Cir. 1998).

Here, the ALJ did not abuse his discretion in denying the request to subpoena Dr. Elkin. Like in *Yancey*, Henny had a fair and meaningful opportunity to present her case, including having her treating physician and chiropractor's opinions carefully reviewed and considered, the opportunity to submit additional medical evidence, and the opportunity to testify. Indeed, at the hearing on July 16, 2013, Plaintiff's counsel stated, "[a]s of now I know of no outstanding medical records that we would be able to retrieve," and declined the ALJ's offer to help retrieve any outstanding records, representing that there are "no identifiable treating sources that we would request records from." R. 44. Moreover, like in *DeChirico*, Plaintiff was represented by counsel, her subpoena request did not comply with 20 C.F.R. § 404.950(d)(2) and she did not offer any specific reason that the subpoena was necessary, stating only that "we request a supplemental hearing where Dr. Elkin is subpoenaed to submit to cross examination as to his findings." R. 402. Thus, the ALJ did not abuse his discretion.

### C. Credibility Determination

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit her subjective assessment of the degree of her impairment. *Tejada v. Apfel*, 167 F.3d 770, 775–76 (2d Cir. 1999). Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step, considering "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (alternations in original) (quoting 20 C.F.R. §

28

404.1529(a)).

If a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should "consider all available evidence," including the claimant's daily activities, the location, nature, extent, and duration of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, other treatment undertaken to relieve symptoms, any measures the claimant uses to relieve pain or other symptoms, and other factors. *Cichocki v. Astrue*, 534 F. App'x 71, 75–76 (2d Cir. 2013) (summary order) (citing 20 C.F.R. § 416.929(c)(1)). SSA regulations provide that it "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2); *accord id.* § 416.929(c)(2).

When ruling on credibility, the ALJ must take all pertinent evidence into consideration and provide "specific reasons for the finding on credibility, supported by the evidence in the case record." *Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996); *see e.g.*, *Guerrero v. Colvin*, No. 16-CV-3290, 2016 WL 7339114, at *5 (S.D.N.Y Dec. 19, 2016). The ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." *Tejada v. Apfel*, 167 F.3d 770, 775–76 (2d Cir. 1999) (summarizing and citing with approval a decision in *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).

On appeal, "an ALJ's credibility finding is entitled to deference and will be set aside only if it is not set forth 'with sufficient specificity to enable [a reviewing court] to decide whether [it]

29

is supported by substantial evidence.'" *Illenberg v. Colvin*, No. 13-CV-9016, 2014 WL 6969550, at \*21 (S.D.N.Y. Dec. 9, 2014) (alternation in original) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)); *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."); *see Selian*, 708 F.3d at 420. "It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

The ALJ in this case set out with specificity the basis for his credibility determination, and his determination that Henny was not wholly credible is supported by substantial evidence, thus entitling it to deference. The ALJ provided five reasons why Henny's allegations of debilitating symptoms should be deemed to be not wholly credible: (1) Henny's daily activities—including cooking, bathing, and cleaning—are not limited to the extent one would expect given her complaints of disabling symptoms; (2) her treatment for her allegedly disabling impairments has been essentially routine and/or conservative in nature and Henny was "evasive" about her marijuana use during her testimony; (3) the opinions from treating or examining physicians that indicate that Henny is currently disabled are not well-supported, and records of multiple examining doctors noted that her claimed symptoms were inconsistent with her behavior during the examinations; (4) she worked only sporadically prior to the alleged disability onset date; and (5) Henny betrayed no evidence of debilitating symptoms while testifying at the hearing, and according to her own testimony her symptoms are the direct result of a motor vehicle accident in

30

April 2009, but she continued working for another 22 months after the accident and did not seek medical treatment for a substantial period of time. R. 27–28.

Each of these five reasons given by the ALJ for his credibility determination is supported by substantial evidence in the record. First, Henny testified that she lives by herself and that she does "everything on [her] own," although she "do[es] have help from [her] boyfriend." R. 104. When asked, "What kind of things do you do on your own?" Henny replied, "I cook, clean." R. 104. Henny also testified that she is able to do to the shopping with the assistance of her boyfriend, while her boyfriend does the laundry. Although Henny did testify that her impairments have affected the manner and frequency with which she cleans, she is still able to do it. R 125–26; *see also* 311–16 (function report completed by Henny explaining that although she cannot prepare elaborate meals any longer and must "keep it simple" she is able to prepare food or meals daily).

Second, the medical records support the ALJ's finding that the treatment Henny received was limited to chiropractic manipulation, two series of lumbar epidural steroid injections, physical therapy, over the counter medication, and Lidoderm (non-narcotic patch). *See* R. 559–61 (Disability Evaluation by treating Dr. Vasishtha summarizing his treatment of Henny); R. 611–19 (affidavit for treating Chiropractor Mariyam Mathew); R. 491-94 (New York State Office of Temporary and Disability Assistance questionnaire completed by Dr. Mathew). The ALJ correctly considered the nature of Henny's treatment as just one of many factors in assessing her credibility and substantial evidence supports its conclusion that Henny's treatment has been "essentially routine and/or conservative in nature." R. 27. *See Burgess*, 537 F.3d at 129 ("The fact that a patient takes only over-the-counter medicine to alleviate her pain may . . . help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record, such as the opinions of other examining physicians and a

31

negative MRI."). It is true that the ALJ's record based observation that Dr. Mathew had last treated claimant in October 2011 was ultimately incorrect,[10] but that observation was just one of many factors that the ALJ relied on to conclude that Henny's treatment was essentially routine or conservative.[11]

Third, as discussed in more detail, *supra* Section V.A., the ALJ did not err in deciding what weight to give to the medical evidence, as there is substantial evidence to support the ALJ's conclusion that the treating physician's opinion that Henny is currently disabled is not well supported by the record.

Fourth, Henny's employment history shows that she has worked almost every year since 1990 until the onset of her disability, but in virtually all of these years she earned between $500 and $10,000, which provides support for the ALJ's conclusion that she worked "only sporadically." R. 28; *see* R. 292–93.

---

[10] In Dr. Mathew's affidavit, dated September 20, 2012, she stated that the last "comprehensive examination" of Henny was performed on October 5, 2011. Evidence in the record, however, indicates that Henny continued chiropractic treatment beyond this time. For example, on 10/19/2013 Dr. Mathew filled out a multiple impairment questionnaire, which was submitted to the Appeals Council and became part of the administrative record. In this questionnaire, Dr. Mathew stated that her most recent examination of Henny was 10/5/2013 and Henny receives treatment "1-2x per week." R. 670.

[11] In his opinion, the ALJ also found Henny to be "evasive" in describing her marijuana use. R. 27. This Court finds it difficult to discern from the transcript whether Henny intended to be less than candid. For example, she made the comment "I just don't like drugs" in response to the ALJ's question "[w]hy aren't you taking anything stronger for pain other than Lidoderm patches and over-the-counter medication?" R. 113. And after initially answering "[n]o" to the question "[d]o you use any kind of street drugs, cocaine, marijuana, heroin or anything like that?, Henny immediately corrected herself, noting that she "use[s] marijuana," R. 114–15. On the other hand, it is true that after she informed the consultative examiner that she used marijuana daily, R. 509, at the hearing (albeit, over a year later) she characterized her marijuana use as less frequent, *see* R. 115. In addition, although she initially testified that she used "marijuana from time to time," when asked the follow-up question, "[h]ow often do you use marijuana?" she responded "[o]nce a week, twice a week maybe." *Id*. In any event, the Court need not rely on the characterization of this testimony as "evasive" to find that the ALJ's credibility determination was supported by substantial evidence, as the ALJ identified numerous other specific reasons he found Henny to be not wholly credible.

32

Fifth, the ALJ's observations of Henny during the hearings are entitled to deference. One hearing lasted 56 minutes, *see* R. 48 (hearing commenced at 9:31 a.m.); R. 95 (hearing ended at 10:27 a.m.), and the other lasted 40 minutes, *see* R. 98 (hearing commenced at 10:14 a.m.); R. 131 (hearing ended at 10:54). The ALJ acknowledged that the hearing was "short-lived" and so only gave the apparent lack of debilitating symptoms during the hearing "some slight weight." R. 28. Given, however, that Henny testified she can only sit for "ten, 15 minutes," R. 70, before needing to lay down on her stomach for "half an hour, 45 minutes," R. 70, the ALJ's observations of Henny for 40 minutes and 56 minutes are relevant and supported. *See* 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including . . . observations by our employees and other persons."); SSR 96-7P, 1996 WL 374186 *5 ("In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.").

Moreover, given that Henny attributes her impairments to a car accident that occurred in April 2009, it was relevant for the ALJ to consider that she continued working until February 2011,[12] and did not seek treatment for a substantial period of time after the accident. Although the ALJ stated that Henny did not seek treatment "for the first two years of her alleged impairment," the record shows that Henny sought treatment on December 21, 2010, R. 484–89, 20 months after the accident. Henny explains that at the time of the accident she "did not have, nor was able to afford medical insurance," and was uninsured until November 2010, after which she immediately

---

[12] Indeed, Henny's highest earning years were 2009 and 2010, during which she earned $23,265.44 and $23,780.77, respectively, R. 293, providing further support for the ALJ's finding that the 2009 accident did not prevent Henny from working.

33

sought treatment, Pl.'s Opp. at 1.[13]   Nonetheless, the ALJ's finding that Henny did not seek treatment for a substantial amount of time after her alleged impairment is supported by the record.

The ALJ's credibility determination is supported by substantial evidence.  Although the Court finds there were two minor inconsistencies with the current record, namely that Dr. Mathew had not treated Henny since October 2011, *see infra* notes 8 and 10, and the number of months that passed after the car accident before Henny sought medical treatment, *see infra* text accompanying note 13, those do not sufficiently undermine the rest of the ALJ's well-reasoned and thorough credibility analysis so as to require remand.

### D.  Sit/Stand Interval

Henny also argued to the Appeals Council that by neglecting to "enumerate the specific interval at which the claimant would need to alternate between sitting and standing throughout an eight-hour work day" to be able to perform sedentary work, the ALJ "failed to establish the necessary parameters regarding the erosion of the claimant's occupational base." R. 406.[14]   Henny argued that the ALJ's mere determination that she "must have the ability to sit and stand at will" violated SSR 96-9p, which requires that the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." *Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work—Implications of a Residual Functional*

---

[13] In her brief opposing judgment on the pleadings, Henny argues, for the first time, that she attempted to get treatment in 2009, and that she has "an August 2009 Orthopedic referral from Dr. Debra Grohman that is missing from the PCP records." Pl.'s Opp. at 3.  No such referral has been submitted, nor would it change the fact that she did not seek treatment for many months after the accident.

[14] Although Henny does not press this specific argument before the Court, she did argue that the ALJ "erred by failing to properly assess the claimant's residual functional capacity." Pl.'s Opp. at 2.  Given Henny's pro se status, the Court broadly construes this statement to include the argument raised by Henny's prior counsel to the Appeals Council.

*Capacity for Less Than Sedentary Work*, SSR 96-9p, 1996 WL 374185, *7 (SSA July 2, 1996).[15]

The ALJ's well-supported determination that Henny would be able to perform a sedentary job if, among other limitations, she could "sit/stand at will," however, was sufficiently specific to comply with SSR 96-9p. The evidence in the record does not establish that Henny's impairments require her to alternate between sitting and standing at a more regimented interval. Numerous courts have held that similar RFC determinations that a claimant must be able to "sit/stand at will" adequately specify a claimant's sit/stand requirement and satisfy SSR 96-9p. "No additional specificity is called for under Social Security Ruling 96-9p." *Miller v. Astrue*, No. 11-CV-4103, 2013 WL 789232, at *10 (E.D.N.Y. Mar. 1, 2013); *see Evans v. Astrue*, 2012 WL 6204219, at *8 (W.D.N.Y. Dec. 12, 2012) ("I find that the ALJ's residual functional capacity finding of 'sit or stand alternatively,' the ALJ's hypothetical question, and the testimony of the vocational expert were all consistent with an at-will sit/stand option, and accordingly, no greater specificity was required." (citation omitted)); *Sanchez v. Astrue*, No. 07-CV-6293, 2008 WL 4344567, at *7 (S.D.N.Y. Sept. 17, 2008), *report and recommendation adopted*, 2009 WL 874203 (S.D.N.Y. Mar. 30, 2009) (holding RFC description that claimant could perform "a range of sedentary work with no more than occasional postural positions and the opportunity to alternate sit/stand positions at will," was "sufficiently specific to satisfy the requirements of SSR 96-9p."); *Magee v. Astrue*, 2008 WL 4186336, *7 (N.D.N.Y. Sept. 9, 2008) ("Although the ALJ's RFC finding did not specifically

---

[15] An RFC determination indicates "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§ ] 404.1545 and 416.945." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). These functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors." *Id.*

state the frequency with which Plaintiff must alternate between sitting and standing in terms of hours, the ALJ did determine that Plaintiff must be able to alternate positions 'at will'—the most flexible of standards—in order to meet the exertional requirements of sedentary work."); *see also* Miller, 2013 WL 789232, at *10 (finding RFC requirement that plaintiff have "the option to sit-stand throughout the day" was adequately specific). *But see Falk v. Colvin*, No. 15-CV-3863, 2016 WL 4411423, at *5 (S.D.N.Y. Aug. 18, 2016) (holding that ALJ's RFC that claimant "required a sit/stand option at will . . . made no determination as to the frequency with which Plaintiff would need to alternate between sitting and standing. . . . [and] thus failed to properly determine the extent of Plaintiff's limitations, rendering the RFC assessment incomplete.").

### E. Ability to Perform Past Relevant Work

The fourth step of the five-step analysis asks whether Henny had the RFC to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ found that Henny "is capable of performing past relevant work as [an] administrative clerk and telemarketer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." R. 30.

The ALJ's conclusion is supported by the testimony of impartial vocational expert Simone, who opined that a person with Henny's "age, education, and work history," who could "only occasionally stoop, crouch, crawl, kneel, and balance and climb[,] can frequently extend, flex and rotate the neck[,] and . . . . would need a sit/stand option at will" could perform Henny's past work as an administrative clerk and telemarketing position, "as she performed it." R. 85. The ALJ reasonably relied on this testimony of the vocation expert, which was based on the ALJ's RFC that was supported by substantial evidence.

The ALJ finding that Henny could perform her past relevant work as an administrative

36

clerk or telemarketer is sufficient to negate a finding of disability at step four. *See e.g., Alfaro v. Astrue,* No. 09-CV-3756, 2011 WL 6259132, at *8 (S.D.N.Y. Dec. 6, 2011). Because Henny did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step. *See* 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.")

## F. Additional Evidence

The Social Security Act provides that a court may order the Secretary to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has explained that a "triple standard for the introduction of new evidence" must be met:

> [A]n appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

*Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988) (citations and quotation marks omitted).

The medical records that Henny attached to her Complaint do not meet this standard and thus a remand is not necessary. Much of the evidence attached to Henny's Complaint, although not in the Administrative Record, is duplicative of information which is in the Administrative Record. Specifically, the orthopedic examinations and treatment plans from Dr. Mathew dated January 7, 2012, June 8, 2012, and October 5, 2013, present similar information as that in the reports from Dr. Mathew which are in the record, and thus would not have influenced the ALJ to

decide claimant's application differently.

Dr. Carlin's report, meanwhile, is dated February 23, 2015, which is more than 1.5 years after the ALJ's determination in this case. "[M]edical evidence generated after an ALJ's decision [cannot] be deemed irrelevant solely because of timing . . . ." *Williams v. Comm'r,* 236 F. App'x 641, 644 (2d Cir. 2007) (summary order). Such evidence may be relevant if it "disclose[s] the severity and continuity of impairments existing [during the relevant period] or may identify additional impairments which could reasonably be presumed to have been present . . . ." *Pollard v. Halter,* 377 F.3d 183, 194 (2d Cir. 2004) (quotation marks omitted). But Henny has offered no reason why this report is "relevant to the claimant's condition during the time period for which benefits were denied and probative." *Tirado,* 842 F.2d at 597. In any event, it does not materially differ from the information the ALJ had in the record when deciding Henny's claim.

Finally, Henny has not even attempted to argue that there is good cause for her failure to present the evidence earlier. "To show good cause, [the claimant] must adequately explain her failure to incorporate the proffered evidence into the administrative record. [The claimant] must go beyond showing that the proffered evidence did not exist during the pendency of the administrative proceeding. Rather, she must establish good cause for failing to produce and present the evidence at that time." *Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S.,* 940 F.2d 40, 45 (2d Cir. 1991). Here, Henny has proffered no reason at all for failing to submit these documents earlier, let alone one that would meet the good cause standard. Henny was represented by counsel below, and, on review of the record, the Court finds that the ALJ fulfilled his duty to develop "a complete medical record before making a disability determination." *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Judgment on the Pleadings is

granted.  The Clerk of Court is respectfully requested to close the motion pending at Docket

Number 110 and close the case.


SO ORDERED.

Dated:     March 15, 2017
           New York, New York

                                    _____
                                    Ronnie Abrams
                                    United States District Judge